IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GRADY A. LEE, SR., #171618,    )
    )
      Plaintiff,    )
    )
v.    )    CIVIL ACTION NO. 2:14-CV-105-WHA
    )    [WO]
    )
CORRECTIONAL MEDICAL SERVICES,    )
    )
      Defendant.    )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I. INTRODUCTION**

This cause of action is pending before the court on a 42 U.S.C. § 1983 complaint filed by Grady A. Lee, Sr. ("Lee"), an indigent state inmate, on February 20, 2014. In this complaint, Lee challenges the medical treatment provided to him for various chronic medical conditions during his confinement at the Ventress Correctional Facility ("Ventress").

On July 31, 2015, Lee filed a Motion for Temporary Restraining Order, *Doc. No. 33*, which the court construed to contain a Motion for Preliminary Injunction. *See Order of August 3, 2015 - Doc. No. 34*. In this motion, Lee requests issuance of an order requiring that medical personnel refer him to free-world physicians or a hospital for treatment of blood in his stools, COPD (Chronic Obstructive Pulmonary Disease) and loss of hearing. *Doc. No. 33* at 1-2. On August 4, 2015, the court entered an order requiring that the defendant show cause why Lee's motion for preliminary injunction should not be granted. *Doc. No. 35*. The defendant filed a response to this order, supported by relevant evidentiary materials, in which it asserts that Lee is not entitled to preliminary injunctive relief. *Doc. No. 36*.

Upon review of the motion for preliminary injunction and the response to the motion filed by the defendant, the court concludes that the plaintiff's motion for preliminary injunction is due to be denied.

## II.  STANDARD OF REVIEW

The decision to grant or deny a preliminary injunction "is within the sound discretion of the district court...." *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002).  This court may grant a preliminary injunction only if Lee demonstrates each of the following prerequisites:  (1) a substantial likelihood of success on the merits; (2) a substantial threat irreparable injury will occur absent issuance of the injunction; (3) the threatened injury outweighs the potential damage the requested injunction may cause the non-moving parties; and (4) the injunction would not be adverse to the public interest.  *Palmer*, 287 F.3d at 1329; *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir. 1998); *Cate v. Oldham*, 707 F.2d 1176 (11th Cir. 1983); *Shatel Corp. v. Mao Ta Lumber and Yacht Corp.*, 697 F.2d 1352 (11th Cir. 1983).  "In this Circuit, '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the "burden of persuasion"' as to the four requisites."  *McDonald's*, 147 F.3d at 1306; *All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989) (a preliminary injunction is issued only when "drastic relief" is necessary); *Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 179 (5th Cir. 1975) (grant of preliminary injunction "is the exception rather than the rule," and movant must clearly carry the burden of persuasion).  The moving party's failure to demonstrate a "substantial likelihood of success on the merits" may defeat the party's claim, regardless of the party's ability to establish any of the other elements. *Church v. City of Huntsville*,

30 F.3d 1332, 1342 (11th Cir. 1994); *see also Siegel v. Lepore,* 234 F.3d 1163, 1176 (11th Cir. 2000) (noting that "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper"). "'The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated.' *Northeastern Fl. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fl.*, 896 F.2d 1283, 1284 (11th Cir.1990)." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001).

### III.  DISCUSSION

The evidentiary materials submitted by the defendant in support of its response, including relevant medical records and affidavits from medical personnel, establish that Lee has been provided and is currently receiving medical treatment for each of his conditions.  The medical records support this assertion and further establish that Lee has been routinely evaluated, examined, prescribed medications, issued medical profiles and undergone various test procedures in an effort to treat his conditions.  Additionally, medical personnel also referred Lee to a free-world gastrointestinal specialist for a colonoscopy in an effort to address his complaints of bloody stools.  In response to the allegations set forth by Lee in the instant motion for preliminary injunction, Dr. John Peasant, the Medical Director at Ventress, provides the following information:

> ... Based upon my review of [Mr. Lee's] medical records [which have been filed in this case], I can state unequivocally that neither I nor the other members of the Ventress medical staff have denied Mr. Lee any necessary or appropriate medical care, including any medical care for the various complaints raised by Mr. Lee during his incarceration related to his rectal bleeding, COPD or hearing loss.
> Mr. Lee appeared at sick call on November 15, 2014. During ths sick call evaluation, Mr. Lee complained of blood in his stool and upon evaluation, the medical staff did not notice any evidence of any bloody discharge from Mr. Lee's

rectum, but did notice that he did have an external hemorrhoid. At the conclusion of sick call, Mr. Lee was instructed to undergo certain additional testing, including the collection of stool samples to test for the presence of blood. Mr. Lee received orders to provide stool samples for a period of three (3) days beginning November 15, 2014. At that time, Mr. Lee was also informed that he would receive an appointment with me *after* providing the required stool samples on November 20, 2014. Mr. Lee actually signed the document related to the provision of stool samples, thereby acknowledging his awareness of the appointment date and the need for the stool samples.

Once the medical staff provided orders to Mr. Lee for the provision of stool samples, Mr. Lee's refusals to cooperate began. On November 20, 2014, Mr. Lee refused to appear for an appointment with me. When asked by a member of the nursing staff to provide a stool sample, as well as undergo a rectal exam on November 24, 2014, in response [to] his complaints of rectal bleeding, Mr. Lee refused. Mr. Lee also refused his subsequent appointment with me on December 9, 2014. The following day, Mr. Lee refused to undergo lab work or to have blood work drawn, telling the medical staff that "yall ain't sticking me." When Mr. Lee arrived in the healthcare unit for sick call evaluation on December 11, 2014, he walked through the healthcare unit, stating "I'm not sick" and telling members of the medical staff that he only needed his medical classification changed from a "medical hold" to some other designation that would [permit] him to move to another facility. Mr. Lee next refused to undergo an examination by a member of the Ventress medical staff on December 30, 2014. Finally, when we attempted to follow-up with Mr. Lee on January 5, 2015, he refused to attend an appointment with me scheduled for that date. As discussed below, Mr. Lee not only refused appointments with me during this period of time when he claims he was experiencing periods of rectal bleeding, he routinely refused to appear for the chronic care evaluations scheduled for him on a quarterly basis.

Mr. Lee did not attend a chronic care clinic for a period of months, but finally appeared on March 18, 2015, for evaluation. During the course of the chronic care clinic, the medical staff continued to [impress] upon Mr. Lee the importance of taking his medications as prescribed. However, during the March, 2015, chronic care clinic, Mr. Lee did not mention any of the complaints referenced in his most recent filing in this action [the current motion for preliminary injunction].

Mr. Lee was evaluated during sick call on March 24, 2015 for complaints of difficulty urinating and bloody stools. It is important to note that this was the first occasion that Mr. Lee raised complaints related to bloody stools *and* voluntarily appeared for evaluation by the medical staff since November of 2014 (i.e. a period of roughly four months). During this four (4) month period, Mr. Lee's failure to cooperate in appearing for appointments and undergoing the necessary testing delayed our evaluation and testing process.

Mr. Lee submitted a sick call request form dated March 22, 2015, requesting

to see me regarding complaints of constipation and bloody stools. Mr. Lee was referred to a practitioner for further evaluation after a March 24, 2015, sick call evaluation. I evaluated Mr. Lee on March 30, 2015 for his primary complaints of difficulty urinating though some complaints of bowel issues were mentioned. Importantly, only three (3) weeks earlier, a urinalysis conducted on Mr. Lee dated March 10, 2015 was normal in all respects. During the course of this March 30, 2015, evaluation, I did not notice any particular signs or symptoms that were causing his difficulty urinating or his related complaints of constipation. At the conclusion of this appointment, I instructed Mr. Lee to undergo certain lab testing in order to further assess his condition, prescribed him with medication to assist with his urination and instructed him to notify us if his symptoms changed in any way.

Mr. Lee submitted a sick call request form simply requesting to see me on April 7, 2015, and I saw him the following day at which time he continued to complain of bloody stools. At the conclusion of this appointment, I also prescribed Mr. Lee with certain medication in order to alleviate these symptoms, including a stool softener, and also ordered him to follow up with certain lab work in order to determine the cause of his ongoing urinary and stool complaints. The PSA test (i.e. prostate-related testing for purposes of evaluating urinary complaints) ordered by me at that time came back normal in all respects.

Mr. Lee submitted another sick call request form dated April 19, 2015, complaining of bloody stools. The medical staff evaluated Mr. Lee for complaints of bloody stools on April 21, 2015, at which time he received an appointment with me. When I saw Mr. Lee on April 27, 2015, I informed him that we would not be able to further diagnose his condition without collecting stool samples and he agreed to cooperate in providing the samples to us for diagnosis purposes. I ordered Mr. Lee to appear for a follow-[up] appointment with me on May 12, 2015, at which time he continued to complain of bloody stools. During the course of the May 12, 2015, appointment, I informed Mr. Lee that the prior stool samples collected were negative for any blood and, therefore, did not seem to suggest that his complaints were accurate. Therefore, in order to eliminate any further concerns related to his complaints of bloody stools, I recommended that he be evaluated by a gastrointestinal specialist. On May 12, 2015, I completed documentation necessary for Mr. Lee to undergo a colonoscopy. On May 22, 2015, I completed the final document necessary for Mr. Lee to receive the off-site gastroenterology referral.

Mr. Lee first attended a consultation with [the] offsite gastroenterologist [to which he was referred] on May 26, 2015, at which time he was scheduled for a colonoscopy. Mr. Lee underwent a colonoscopy at the Troy Regional Medical Center on June 10, 2015. The surgical pathology report issued by Alabama Pathology Associates, P.C. dated June 10, 2015 indicated the existence of non-cancerous rectal polyps found in the course of the colonoscopy. In short, the colonoscopy did not reveal any medical condition causing any rectal bleeding or any basis upon which to order any further testing or provide any specific care.

I saw Mr. Lee again on June 11, 2015 after he underwent the colonoscopy, which did not reveal any abnormalities and failed to provide any supporting evidence for Mr. Lee's complaints of bloody stools. At that time, I informed Mr. Lee that we could not find any medical evidence to support his complaints of bloody stools or any evidence suggesting the cause of such a condition and that he should notify the medical staff if his symptoms in any way change.

Mr. Lee appeared for evaluation during sick call on June 23, 2015 with complaints of blood in his stool. Mr. Lee was referred for further evaluation by a practitioner that same day. I last saw Mr. Lee on June 23, 2015, regarding his continued complaints of bloody stools. At that time, I again notified Mr. Lee that based on the prior testing, including the collection of stool samples and the colonoscopy, there was no basis upon which we could provide him with any treatment and did not see any evidence of any blood in his stools. However, at the conclusion of this appointment, I called the offsite gastrointestinal specialist to inquire as to whether any additional testing should be done and, based on my telephone call with the offsite gastrointestinal specialist, did not understand that any further treatment or examination was necessary to rule out any potential cause for Mr. Lee's continuing complaints of rectal bleeding.

It is particularly important to note the nature of Mr. Lee's allegations related to rectal bleeding. In his filing, Mr. Lee describes the bleeding [] as similar to "taking a cup of coffee full of blood and pouring it in a [toilet]." This is important because Mr. Lee's statements, if true, would mean that Mr. Lee's bleeding must be originating from the lower intestinal tract (i.e. the colon, rectum, etc.) as opposed to the upper intestinal tract (i.e. esophagus, small intestine, etc.) simply because bleeding in the upper intestinal tract would not result in this type of bloody discharge, but would manifest itself with different symptoms. Therefore, if Mr. Lee was, in fact, experiencing a serious medical condition in his lower intestinal tract, it would have been identified through a colonoscopy. I cannot identify any further off-site or specialty care which would be warranted or even valuable at this stage of our monitoring of Mr. Lee. Nevertheless, we will continue to monitor his complaints as well as monitoring him for symptoms which do provide some indication of a treatable medical condition. However, as of this date, I firmly believe that we have been diligent and thorough in our evaluation of Mr. Lee, given the nature of his complaints.

In addition to his complaints of rectal bleeding and inadequate care for his respiratory condition, Mr. Lee also reasserts many of the same concerns previously raised including choking on his saliva, as well as a loss of hearing in his left ear and reduced hearing in his right ear.

As indicated in my original affidavit, Mr. Lee was diagnosed with chronic obstructive pulmonary disease, hypertension, and gastroesophageal reflux disease at the time of his arrival into the department of corrections system in July of 2013. An x-ray of Mr. Lee's face and sinuses on September 12, 2014, revealed that his sinuses

were "grossly clear" and there was "no radiographic evidence of acute disease in the orbits..."  When the medical staff evaluated Mr. Lee during the chronic care clinic in September of 2014, he mentioned his difficulties breathing at night and he was instructed to utilize the inhaler that had been prescribed for him to alleviate his problems.  During the September, 2014, chronic care appointment, Mr. Lee was encouraged to improve his compliance with the medications prescribed for him which would alleviate many of his medical complaints.  Mr. Lee next underwent a chest x-ray on September 24, 2014, which was null on all respects.

Following this September, 2014, episode of complaints related to difficulties breathing, Mr. Lee did not voice any respiratory complaints or note any until November of 2014, when he complained of symptoms akin to a cold or sinus condition.  Mr. Lee appeared for sick call on November 5, 2014.  At sick call, Mr. Lee complained that he was having symptoms of a headache and chest congestion after receiving a flu shot approximately two days earlier.  During sick call, the nursing staff provided Mr. Lee with certain over the counter medication in order to treat his symptoms and he was referred for further evaluation the following day.  Mr. Lee also complained of cold symptoms during the November 15, 2014 sick call.  In response to these complaints, Mr. Lee received over the counter cold medication and Tylenol, which apparently resolved his complaints without further issue.

Throughout his incarceration, the Ventress medical staff attempted to monitor Mr. Lee's COPD condition through the chronic care clinic process with limited success due to Mr. Lee's non-compliance and repeated refusals to follow the treatment plans established for him.  However, as referenced above, it is difficult to monitor Mr. Lee's chronic conditions when he does not appear for chronic care clinics.  Mr. Lee refused to attend a chronic care appointment on December 17, 2014.  Mr. Lee appeared for evaluation during sick call on February 26, 2015, for complaints of heartburn, which he describes as lasting for approximately two months, but was clearly not respiratory in nature.  Mr. Lee was evaluated during sick call by the nursing staff and was educated as to potential causes of his heartburn.  Mr. Lee did not actually attend another chronic care appointment until March 18, 2015.  The most recent chest x-ray taken of Mr. Lee was normal in all respects.

With respect to Mr. Lee's COPD, the medical staff has monitored his condition through the chronic care process and there is no medical evidence of any kind that his COPD requires any further treatment in this regard.  A review of Mr. Lee's medical records reveals an extremely limited set of complaints and practically no sick call request forms raising the complaints mentioned in his recent filing.  The simple fact remains that Mr. Lee is habitually non-compliant with the medication and treatment regimen provided to him, including the respiratory therapy prescribed by me for his COPD condition.  Despite his habitual non-compliance, I cannot identify a single occasion when Mr. Lee reported to the health care unit and the nursing staff confirmed that he was experiencing any type of serious respiratory distress.  Once again, I cannot fathom what type of "care" Mr. Lee believes he should receive "off-

site" which is not available and being provided to him at Ventress.

 I evaluated Mr. Lee several times related to his complaints of left ear pain, which are attributable to one known condition:  the build-up of ear wax [in each of Mr. Lee's ears].  On October 1, 2014, I entered orders for ... Mr. Lee to attend the follow up evaluation of his left ear in approximately four weeks.  I cannot identify any medical treatment or care which an off-site provider could provide for Mr. Lee's current ear condition (i.e. the presence of ear wax) which he has not effectively been provided on-site at Ventress.

 I saw Mr. Lee on November 6, 2014, for complaints of headaches and other cold related symptoms.  During the course of the November 6, 2014, examination, Mr. Lee did complain of pain in his right ear as well as a reduced ability to hear out of his left ear.  Upon examination, I determined that Mr. Lee had experienced a copious amount of earwax build up in his ears which would require removal, which was ordered immediately.  At the conclusion of the appointment, I instructed Mr. Lee to appear for a period of ten days at the health care unit for treatment call at which time he would receive treatments intended to remove the large amount of earwax filling his ears.

 Mr. Lee's medical records are replete with instances of non-compliance on his part, including occasions when the medical staff at Ventress counseled Mr. Lee on his failure and/or refusal to comply with our directives regarding his medications.

*Attachment 2 to the Defendants' Response - Doc. No. 36-2* at 2-10 (citations to medical records omitted) (emphasis in original). The medical records compiled contemporaneously with the treatment provided to Lee corroborate Dr. Peasant's affidavit.

 Turning to the first prerequisite for issuance of preliminary injunctive relief, the court finds that Lee has failed to demonstrate a substantial likelihood of success on the merits of his claims.  Lee likewise fails to establish a substantial threat that he will suffer the requisite irreparable injury absent issuance of a preliminary injunction.  The third factor, balancing potential harm to the parties, weighs much more heavily in favor of the defendant, as issuance of the requested injunction would interfere with the ability of medical personnel to effectively assess and treat inmates in accordance with their professional judgment.  Finally, the public interest element of the equation is, at best, a neutral factor at this juncture. Thus, Lee has failed to meet his burden of demonstrating the existence of each

prerequisite necessary to warrant issuance of a preliminary injunction.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The motion for preliminary injunction filed by Lee be DENIED.

2.  This case be referred back to the undersigned for additional proceedings.

It is further

ORDERED that on or before September 3, 2015 the parties may file objections to the Recommendation.  Any objection must specifically identify the findings in the  Recommendation objected to.  Frivolous, conclusive or general objections will not be considered by the District Court. The parties are further advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.  Failure to file written objections to the proposed findings in the Recommendation shall bar the party from a de novo determination by the District Court of issues addressed in the Recommendation and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *see Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, en banc), adopting as binding precedent all decisions of the former Fifth Circuit issued prior to September 30, 1981.

DONE, this 20th day of August, 2015.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE